**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

ELEANOR CANTER,
     Plaintiff,

     v.

DISABILITY NETWORK WEST MICHIGAN;
THE CITY OF MUSKEGON; FRANKLIN
PETERSON; KIRK BRIGGS; GARY POST;
BRAD HASTINGS; and DIANE FLESER,
     Defendants

_____ /

Case No.: 20-cv-672
Hon. _____

**COMPLAINT
AND JURY DEMAND**

OUTSIDE LEGAL COUNSEL PLC
PHILIP L. ELLISON (P74117)
Attorney for Plaintiff
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

_____

**COMPLAINT**

     NOW COMES Plaintiff ELEANOR CANTER, by counsel, and complains unto the

Court as follows.

**INTRODUCTION**

     1.     All citizens, including Plaintiff ELEANOR CANTER, are entitled to petition

the government and criticize discriminatory practices without fear of retribution, especially

when those criticism point out violations of federal disability laws. This lawsuit seeks to

vindicate Plaintiff CANTER's constitutional rights and end the past and ongoing joint

campaign of retaliation, including by conspiracy among various actors and by the

improper use of the Michigan state court judiciary.

1

**JURISDICTION & VENUE**

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1334 because the controversy centers on federal questions under the First Amendment to the United States Constitution, the *Americans with Disabilities Act* ("ADA"), the *Rehabilitation Act of 1973* ("Rehabilitation Act"), as amended, 29 U.S.C. § 701 et. seq.

3.      This Court has jurisdiction over state-law claims arising from the same transactions and events pursuant to 28 U.S.C. § 1367.

4.      Declaratory relief is requested under 28 U.S.C. §§ 2201, 2202.

5.      Damages, fees, and costs of the action are requested under 42 U.S.C. §§ 1983 and 1988, and the corresponding provisions of Michigan law.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 as all Defendants either reside or conduct business within the boundaries of the Western District of Michigan, which is also where most of the wrongful acts occurred.

**PLAINTIFF ELEANOR CANTER**

7.      Plaintiff ELEANOR CANTER resides in the City and County of Muskegon, Michigan where she advocates and has advocated on behalf of disabled individuals for most of her life.

8.      Due to a progressive neurological condition which requires the use of a mobility device, Plaintiff ELEANOR CANTER qualifies for protections and/or accommodations under the *Americans with Disabilities Act* ("ADA"), the *Rehabilitation Act*, and Michigan's *Persons With Disabilities Civil Rights Act* ("PWDCRA").

**CITY OF MUSKEGON DEFENDANTS**

9.      Defendant CITY OF MUSKEGON ("CITY") is a municipal corporation formed under the laws of the State of Michigan.  The CITY operates under a "Council-Manager" form of government with a seven-member city commission (including the mayor).  By way of a 2010 settlement agreement with United States Department of Justice, the CITY was required to develop and implement policies and training programs to ensure accessibility and compliance with the ADA.  (DJ-2014-38-109)

10.     Defendant FRANKLIN PETERSON ("FRANK PETERSON" or "PETERSON") resides and works in the City of Muskegon, Michigan and is the City Manager of the CITY. As city manager (a position appointed by the CITY commission), PETERSON functions as the CITY's Chief Executive Officer.  Peterson is sued in his individual capacity.

11.     Defendant KIRK BRIGGS ("BRIGGS") conducts business throughout Muskegon County and the Western District of Michigan.  For the CITY OF MUSKEGON, BRIGGS identifies himself as: Building Official/Inspector; Plan reviewer; Rental and Code Enforcement Supervisor; Dangerous Building Inspector; and Fire Inspector Supervisor for the City of Muskegon.  KIRK BRIGGS is being sued in his individual capacity.

12.     Defendant GARY POST resides and does business within the Western District of Michigan.  At all times relevant to this lawsuit, GARY POST was enmeshed with CITY officials in efforts to avoid his obligations to ensure that the Heritage Square Commons and its tenancies (including Drip Drop Drink coffee shop) were designed and constructed in compliance with the law.  GARY POST is sued in his individual capacity.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

3

**DISABILITY NETWORK WEST MICHIGAN DEFENDANTS**

13.     Defendant DISABILITY NETWORK WEST MICHIGAN ("DNWM") is a Michigan Non-Profit Corporation registered at 27 E. Clay Avenue, Muskegon, Michigan 49442. DMWM does business and raises funds throughout the Western District of Michigan. DNWM is one of Michigan's fifteen Centers for Independent Living.

14.     Defendant BRAD HASTINGS ("HASTINGS") is employed as the Advocacy and ADA Coordinator for DNWM where he performs quasi-governmental functions under state and federal law. HASTINGS also holds a contractual position with and performs governmental functions for the CITY OF MUSKEGON. HASTINGS is sued in his personal capacity.

15.     Defendant DIANE FLESER ("FLESER") lives and regularly conducts business within the Western District of Michigan. FLESER is the Executive Director of DNWM who performs quasi-governmental functions for the State of Michigan and the City of Muskegon, and is sued in her individual capacity.

**BACKGROUND FACTS: MUSKEGON'S DOWNTOWN REDEVELOPMENT**

16.     After many years of post-industrial decline, efforts to revitalize the CITY's downtown district took shape at the turn of the century. The CITY's unique geographic features and an abundance of financial incentives presented a wide range of opportunities for developers. Nonetheless, a substantial number of projects were abandoned or stalled due to various challenges and setbacks.[1]

17.     "Heritage Square Townhomes" was one of the first housing projects to go forward when the 2003 demolition of the defunct Muskegon Mall left 23 acres of sand and

---

[1] https://www.mlive.com/news/muskegon/2014/09/not_your_parents_downtown_time.html

rubble. Local developer GARY POST broke ground on the high-end townhomes in 2008, long before most investors were prepared to bet on the city's successful comeback.  It would be more than a decade before the first phase of this project reached completion.[2]

18.    In 2012, CITY leaders disbanded its in-house building inspection department and privatized all inspection and permit related services. Per the CITY's contract with "Safe Built Inc. of Michigan," Defendant KIRK BRIGGS became the CITY's Chief Building Official. Together with the newly hired city manager FRANK PETERSON, KIRK BRIGGS and his employees pursued aggressive blight enforcement policies in residential areas.[3]

19.    However, PETERSON and BRIGGS adopted a more "flexible" posture when it came to code enforcement and inspections for downtown developers (such as GARY POST).  As described in a January 30, 2014 newspaper article:[4]

> The Safe Built attitude toward customer service seems to be working, according to officials at the Muskegon Lakeshore Chamber of Commerce who for years have fielded complaints about area inspection departments. Downtown developer Gary Post has been a critic of city inspection practices over the years.
>
> "This is a big improvement over what we experienced before," said Post, who admits through his 40 years in the construction industry he has thought local government has gone too far in regulating construction practices.
>
> "Safe Built is working hard to change the image of city inspections. They are making a serious effort to work with the contractors. There are good positive steps to work with the people."
>
> Peterson said as city manager he appreciates the way Safe Built has handled those needing building inspections. "The code is open to

---

[2]        https://www.mlive.com/news/muskegon/2019/04/downtown-muskegon-townhomes-near-completion-after-11-years.html

[3] https://www.mlive.com/news/muskegon/2012/09/city_of_muskegon_moves_to_priv.html

[4] https://www.mlive.com/news/muskegon/2014/01/city_of_muskegon_to_use_safebu.html

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

*interpretations so a lot of it is about the delivery,"* Peterson said. *"For many it is my way or the highway but not with Safe Built."*

20.     Developer GARY POST would continue to benefit from the CITY's support for downtown developers in his efforts to complete the Heritage Square Townhomes and Heritage Square Commons projects.  The CITY contributed a $500,000 interest free loan in 2014 to assist in a timelier completion of the Heritage Square Townhomes project.[5]

21.     In 2018, FRANK PETERSON urged the CITY Commission to extend another interest free loan of $300,000 so that the next phase the project, **Heritage Square Commons,** could be completed in time for GARY POST to collect approximately $180,000 in state tax credits.  The CITY sweetened the deal by crediting back $5,000 of POST's payments for inspection services.[6]

22.     The CITY was simultaneously partnering with GARY POST on efforts to move the $6.85 million-dollar Ameribank development project forward, fronting $350,000 in CITY funds for selective demolition work while POST held an option to purchase on the property.[7]

### BACKGROUND FACTS: Heritage Square Commons Building
### Completed Without Minimum Number of Accessible Entrances

23.     The Americans with Disabilities Act ("ADA") requires every place of public accommodation to be constructed with at least 60% of public entrances accessible for those with mobility devices. See 2010 ADA Standards, §206.4. When a place of public

---

[5]     https://www.mlive.com/news/muskegon/2014/06/two_new_downtown_muskegon_town.html
Two new downtown Muskegon townhouses to be built with city loan (6/25/14, Lynn Moore)
[6]     https://www.mlive.com/news/muskegon/2018/04/city_gives_developer_300k_loan.html
City gives developer $300K loan to complete downtown project (4/12/18, Ben Solis)
[7]     https://www.mlive.com/news/muskegon/2018/03/old_ameribank_building_being_d.html
Ameribank building being 'deconstructed' ahead of redevelopment (3/27/18, Ben Solis)

accommodation (such as the retail units within Heritage Square Commons) has only two public entrances, *both* must be accessible.

24.    Renderings published by the Muskegon Chronicle in 2014 show that Heritage Square Commons was originally designed <u>with</u> proper accessible main entrances for each of the four retail units.



25.    However, at some point in the final stages of the project, two of the four accessible entrances were eliminated as a deviation from the original plan. After Heritage Square Commons later "passed" inspection, the Drip Drop Drink coffee shop and The Crue Barber Shop opened for business in the two retail units; neither had or have today an ADA compliant accessible main entrance .

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com



(Note the blocking gate across the sidewalk ramp)

26.     The stepped main entrances for these two rental units (Drip Drop Drink and the Crue Barber Shop) made compliance with the 2010 ADA Standards impossible for any business which functioned as a place of public accommodation.

27.     Since at least 2012, the ADA has required that 60% of public entrances must be ADA accessible for each place of public accommodation.

28.     Although local municipalities are not responsible for enforcement of the ADA, KIRK BRIGGS had a legal obligation to ensure that these same requirements were met at various stages of the permitting and inspection process.  This is especially true on a project which partially funded by the loans from the CITY and designed as a public gathering place.

**PLAINTIFF ELEANOR CANTER PETITIONS**
**PUBLIC OFFICIALS REGARDING ACCESSIBILITY CONCERNS**

29.     Shortly after Drip Drop Drink opened for business, Plaintiff ELEANOR CANTER, a life-long advocate for disability rights, was contacted by a member of the community who had been unable to enter the coffee shop for lack of an accessible entrance.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

30.     Plaintiff ELEANOR CANTER contacted CITY officials and expressed concern that two retail units in Heritage Square Commons, a city-funded project, had been constructed, inspected, approved, and then opened for business *without* meeting ADA requirements for accessible entrances.

31.     FRANK PETERSON, KIRK BRIGGS, and GARY POST attempted to deflect Plaintiff CANTER's concerns by explaining that disabled individuals could enter through a storage corridor in the back corner of the coffee shop.

32.     However, to reach the rear entrance, a mobility device would have to navigate a series of back hallways which are cluttered with stored objects.  Further, these hallways could only be accessed through another unmarked entryway in the front of the building.  Passage into the hallway was through a secondary unmarked door—and predicated on an outer entryway that was frequently locked.

33.     Plaintiff ELEANOR CANTER appropriately expressed concern that CITY officials had allowed a prominent, city-funded project to be constructed in this improper manner and that CITY officials wrongfully concluded that Drip Drop Drink complied with ADA requirements for a place of public accommodation.

34.     PETERSON and BRIGGS took offense at CANTER's insistence on strict compliance and what they perceived as an "adversarial" posture.

35.     FRANK PETERSON and KIRK BRIGGS wanted to work with someone who could help them portray an image of concern for disabled citizens, while still having the option to occasionally cut a few corners on ADA compliance.  They wanted a "partner" and not an "adversary."

**THE CITY PARTNERS WITH BRAD HASTINGS & DIANE FLESER
OF DISABILITY NETWORK WEST MICHIGAN)**

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

36.    Defendant FRANK PETERSON was already on a first-name basis with Defendant BRAD HASTINGS.   HASTINGS had proven himself an ally in efforts to expedite progress in redevelopment of the CITY's downtown area.

37.    BRAD HASTINGS had recently been hired as the Advocacy and ADA Coordinator for DISABILITY NETWORK WEST MICHIGAN ("DNWM").[8]

38.    A few days after Plaintiff ELEANOR CANTER submitted her concerns regarding Drip Drop Drink, Defendant BRAD HASTINGS sent correspondence to city manager FRANK PETERSON, Ken Johnson (City Commissioner), Joe Doyle (City Planning Commission and also DNWM board of directors) also noting that Drip Drop Drink was in violation of the ADA.

> *Good Morning Frank, Joe, and Ken,*
>
> *I am emailing to present an issue of accessibility that was brought to our attention recently.*
>
> *The new Drip Drop Drink, located at 926 Second Street, lacks an accessible entrance. (See Photo Below)* ***As this is new construction and is a place of public accommodation, it is required to be accessible and to meet the 2010 Standards of Accessibility.***
>
> *I am curious how something like this was not caught in the design or building inspection phase? I would like to know how we can be a part of the planning process to prevent this from happening in the future? Any guidance would be greatly appreciated.*
>
> *Thank you for your time,*
> *Brad Hastings*
> *Advocacy and ADA Coordinator*
> *Disability Network West Michigan*

---

[8] Per their mission statement, DNWM, a federally funded non-profit exists to advocate and empower "persons with disabilities … ensuring that accessibility is an accepted civil right." Under "How We Advocate" the DNWM website specially identifies a focus on accessible buildings, and "ADA Compliance: Facility accessibility and fair treatment." https://disabilitynetworkwm.org/how-we-advocate/

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

39.     Although Defendant BRAD HASTINGS was identifying the exact same concern which Plaintiff CANTER had presented, FRANK PETERSON and KIRK BRIGGS believed that BRAD HASTINGS would be willing to *partner* with the CITY in applying a "more flexible" reinterpretation of accessibility standards under circumstances where favored downtown developers needed to "get things done."

40.     Defendant PETERSON knew that Defendants HASTINGS and FLESER had been working to garner media exposure for DNWM and establish BRAD HASTINGS as an authority on accessibility and ADA issues.[9]

41.     The CITY Defendants were also aware that DNWM took a very flexible and *business friendly* approach in advocating for ADA compliance.  For example, DNWM advertises paid consultation services for local businesses, *risk free* ADA evaluations,  and a no-hassle pathway to favorable publicity.[10]

42.     In describing their "Seal of Approval" services (Fn.10), there is no indication that a business must meet any particular standard or address any issues before receiving DISABILITY NETWORK's endorsement:

> We are committed to partnering *with your business* to provide **the most affordable**, accessible, environment possible.
>
> …**We also offer the Disability Network Access for All Seal of Approval** for your business. The Access for All seal of approval demonstrates to the disability community that your business has considered the needs of individuals with disabilities are a priority.
>
> *Once your business has been evaluated* **you will be given** the seal to proudly display both at your business and your website.

---

[9] HASTINGS and FLESER circulated press releases and pursued opportunities to make appearances on local radio shows and news outlets. For a recent example see WOOD TV 8: https://www.woodtv.com/health/coronavirus/michigan-mask-mandate-disability-network-explains-impact/

[10] See "for businesses" section at https://disabilitynetworkwm.org/info/

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

43.     DNWM's advertisements specifically assure business that DNWM will **not** report ADA violations.

44.     Other Centers for Independent Living regularly facilitate reports of ADA violations and/or initiate litigation to remedy discriminatory practices by local businesses.

45.     FRANK PETERSON, KIRK BRIGGS, and/or GARY POST seized this opportunity to "team up" with BRAD HASTINGS in a symbiotic partnership with DNWM (the "CITY/DNWM Partnership").

46.     As a purported expert in the field, BRAD HASTINGS was in a position to provide a very "friendly" ADA evaluation of Heritage Square Commons so that Plaintiff ELEANOR CANTER could be persuaded to drop her complaints.

47.     PETERSON, BRIGGS and POST knew that DNWM's "*Access For All* Seal of Approval" would also be useful in discrediting CANTER's advocacy if she continued to oppose the ADA violations at Drip Drop Drink Coffee. This would be a critical step in preventing other government agencies from investigating or scrutinizing the discriminatory acts and practices tolerated by the CITY.

48.     Because BRAD HASTINGS had only recently received ADA training and had not personally experienced the challenges having a qualified disability, a partnership opportunity with the CITY offered an opportunity to gain instant creditability in the community.

49.     Similarly, POST, BRIGGS and PETERSON knew that future circumstances may also require a more flexible application of accessibility standards, so that downtown developers could continue, again, to "get things done."

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

50.     PETERSON and BRIGGS also desired to avoid direct engagement with complainants who presented accessibility concerns.  The CITY/DNWM Partnership was intended to serve as a buffer from disfavored citizen complaints—while simultaneously portraying PETERSON and BRIGGS as public officials who took ADA concerns very seriously.

51.     In his new role as the CITY's agent, BRAD HASTINGS quickly abandoned the concerns he had described regarding Drip Drop Drink's obvious non-compliance with the ADA.

52.     Although not a government official himself, GARY POST had been working closely with FRANK PETERSON and KIRK BRIGGS to skirt ADA requirements and scuttle Plaintiff CANTER's complaints.  In a 3/4/19 message (copied to KIRK BRIGGS & BRAD HASTINGS) Developer GARY POST gleefully put the CITY/DNWM Partnership to good use:

> *Good Morning, Ms. Canter!*
>
> *We met a few weeks ago with Brad Hastings from the Disability Network and Kirk Briggs from Safe Built, the City of Muskegon's inspection department.  It was a very good meeting and we all agree that we are in compliance with ADA. We did agree to add some signage to the building and still need to do that.*
> *Thanks for your concern!   Gary*

53.     A few hours later, CITY Building Official KIRK BRIGGS echoed this sentiment with a more detailed explanation of the position which had been collaboratively developed by the CITY/DNWM Partnership.

> *Thank you for your concern and input on this matter, please understand that the Muskegon Building Department is very driven to*

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

*ensure code compliance including Chapter 11 of the Michigan Building Code regarding accessibility and the ADA codes.*[11]

*Please be aware that Heritage Square Commons on 2nd street is one building and it has 5 entrances and 3 of those entrances are ADA compliant. This complies with the 60% as required in code section 1108.1*

*Please understand that we have also met with Brad Hastings Advocacy and ADA Coordinator Disability Network West Michigan. We have teamed with them and Brad has helped us understand a lot more of the ADA intent.*

*With his input we now know how to make future building even less incumbent in the future.*

*Once again thanks for your input.*

*Sincerely, Kirk Briggs*

54.     The March 4, 2019 message (above) was also copied to FRANK PETERSON, GARY POST, BRAD HASTINGS, and the CITY's police chief, Jeffrey Lewis. In subsequent messages, PETERSON also conveyed his approval of the CITY's reliance on the analysis provided by the CITY's new "accessibility partner."

55.     The contrast between BRAD HASTING's interpretation of ADA compliance *before* and *after* the CITY/DNWM Partnership is jarring. HASTING's original correspondence to the CITY (on November 30, 2018) acknowledged the larger building structure, but specifically (and correctly) stated that ADA requirements applied to each *place of public accommodation.*

> *The new Drip Drop Drink … is a place of public accommodation, it is required to be accessible and meet the 2010 Standards…*

---

[11] This unorthodox conflation of Michigan's Building Code and the ADA requirements relies on acceptance of the premise that a locked door remains "accessible" to the public (under the ADA). POST also fails to apply the ADA's 60% rule to each *place of public accommodation.*

56.     Hastings original position also specified that the "2010 Standards of Accessibility" applied to Drip Drop Drink.

57.     However, after HASTINGS began working for the CITY, he inexplicably began quoting from the antiquated 1999 "ADA Guide for Small Businesses"—a document which had been out of date since 2010.

> Good Afternoon Eleanor, You may know that there is a ADA Guide for Small Businesses. Here is an excerpt from that guide: "When a business has two public entrances, in most cases, only one must be accessible." (excerpt from HASTINGS 3/5/19 email)

58.     In the same message, Hastings explained that Drip Drop Drink's compliance with the ADA had been confirmed via guidance and conclusions tendered by the Department of Justice and the U.S. Access Board.[12]

> This is not the outcome we hoped for, but unfortunately, Port City CDS has decided to meet minimum requirements in this case, at this time. The bare minimum is not our goal, but it is the standard they can legally be held to. There are also complications where the private property meets the public, city sidewalk that complicate the issue of just adding a ramp.
>
> You should know that in assessing this situation, I did not only rely on my own training and technical education of the ADA. I reached out to other Certified ADA Coordinators, as well as the US Access Board and the Department of Justice. It was concluded that while the intent of the standards is to make the main entrances accessible, Port City would meet the bare minimum requirements if the door remained unlocked during business hours and signage was provided to indicate an accessible route.

59.     Almost immediately after bestowing the seal of approval on Heritage Square Commons, HASTINGS was appointed to the Downtown Development Authority.

---

[12] At the time of filing this lawsuit, no such "guidance" or "conclusions" from these federal agencies can be verified among the voluminous correspondence HASTINGS has produced in state court litigation.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

60.    DNWM received the prestige of working with the CITY, a contract for additional public funding, and the CITY's promise of ongoing assistance in suppressing CANTER's complaints about the **CITY/DNWM Partnership.**

61.    PETERSON and other CITY officials also used their connections and influence to arrange a Muskegon Community Foundation grant which would fund a community-wide promotion of DNWM's consulting services for local businesses.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

## COLLABORATIVE EFFORTS TO PROTECT
## THE CITY/DNWM PARTNERSHIP

62.     As it became clear that the CITY/DNWM Partnership was using the DNWM "Access for All Seal of Approval" as cover for discriminatory practices, Plaintiff ELEANOR CANTER began petitioning CITY officials in opposition to the CITY/DNWM Partnership.

63.     Plaintiff CANTER also criticized CITY/DNWM Partnership in public forums and requested that other state and federal agencies investigate.

64.     Based on their shared interest in protecting the CITY/DNWM Partnership, FRANK PETERSON, KIRK BRIGGS, BRAD HASTINGS, DIANE FLESER and GARY POST agreed on a collaborative plan to discredit, discourage, suppress, and punish Plaintiff ELEANOR CANTER's complaints and criticism. Defendants agreed to use their collective influence to portray CANTER as vindictive, dishonest, threatening, and/or abusive—eliminating her ability to effectively advocate on issues related to accessibility and independent living.

65.     DIANE FLESER and BRAD HASTINGS relied on strategies which had been developed by DNWM's public relations firm and circulated variations of their disparaging narrative to a carefully curated list of influential "allies."   DIANE FLESER used her connections and influence to exclude CANTER from participating in Statewide Independent Living Council business, and to undermine CANTER's credibility with federal agencies.

66.     Per the CITY/DNWM Partnership agreements, FRANK PETERSON and KIRK BRIGGS also took action to exclude Plaintiff ELEANOR CANTER from local civic engagement.

67.    In the course of these actions, each of the Defendants took deliberate steps to convey that the adverse actions against Plaintiff CANTER would continue as long as Plaintiff CANTER remained critical of the CITY/DNWM Partnership:

> E.g. BRAD HASTINGS' 3/5/19 message to Plaintiff CANTER:
> *It has been my observation that your approach pushes people away from the table, just as you have pushed us away.*

> E.g. DIANE FLESER's 3/5/19 message to Plaintiff CANTER:
> *Your tactics to belittle and bully, are not conducive to advancing our mission and frankly do not warrant a response, speaking of "new lows". [sic] Your attempts to communicate often result in failed exchanges because of the hostile platform you pursue.*

68.    In written correspondence and a subsequent meeting, PETERSON and BRIGGS repeatedly expressed their disdain for Plaintiff CANTER's allegations of impropriety regarding the CITY/DNWM Partnership.

69.    In April of 2019, PETERSON chastised and admonished Plaintiff CANTER for criticizing the seal of approval which HASTINGS had bestowed on Drip Drop Drink. PETERSON repeatedly identified specific criticism of HASTINGS in his governmental role and identified these statements as the reason why Plaintiff CANTER would have limited opportunity to engage the CITY on accessibility issues.

70.    These actions and statements were all carefully coordinated.  BRIGGS, PETERSON, FLESER and HASTIGNS worked from the same script in their efforts to protect the **CITY/DNWM Partnership** from criticism and scrutiny.

71.    The underlying purpose of the partnership, and the shared objectives in silencing CANTER are succinctly reflected in the 3/11/19 email sent from KIRK BRIGGS to BRAD HASTINGS (emphasis added).

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

> *Brad,*
>
> *It has been a pleasure working with you on this Access issue, you have been a great help. The Building department takes ADA access seriously and works hard to enforce code compliance, your input and team work has been very valuable on this project and others.*
>
> *It is unfortunate that **the city and yourself** [DNWM] **has been the target** of the Accessibility Justice League [i.e. ELEANOR CANTER]. Their approach to the issue and code interpretation have been very irregular, **even bordering on harassment**.*
>
> *The atmosphere of team work that we have with you and the Disability Network West Michigan is where people can best get things done.*
>
> *You have our support.*
>
> *Sincerely,*
>
> *Kirk Briggs*
> *Building Official/Building Inspector Plan Reviewer*

72.    The message cited above was copied to POST, FLESER and several other high-ranking CITY officials.  All the Defendants understood the CITY must fully "support" the CITY/DNWM Partnership in order to preserve the atmosphere where developers could "best get things done" even if in contradiction to federal laws.

## PLAINTIFF CANTER'S INJURIES

73.    As a result of the conduct described above, Plaintiff CANTER was directly and substantially injured in her ability to advocate for an accessible and inclusive city.

74.    Plaintiff CANTER has invested considerable time and effort to educate herself and inform others regarding their rights and obligations under the ADA.  The deliberate and sustained conduct of the Defendants frustrated and interfered with Plaintiff

CANTOR's efforts to make her community more welcoming for individuals with disabilities.

75.     Plaintiff CANTER suffered irreparable harm in that her efforts to participate in government affairs and hold public officials were hindered and chilled by the Defendant's campaign of retaliation.

76.     Plaintiff CANTER was required to spend thousands of dollars in response to sham litigation, legal threats, and the multifaceted effort to silence and suppress Plaintiff CANTER's protected conduct.

77.     The prolonged effort to discredit, demean and stigmatize Plaintiff CANTER resulted in concrete and demonstrable injuries including, but not limited to emotional suffering, stress, anxiety, mortification, and financial hardship.

78.     Plaintiff CANTER continues to suffer injuries due to ongoing acts of retaliation and the specter of future injuries inflicted by powerful government officials and their co-conspirators/partners.

79.     Plaintiff CANTER continues to suffer discrimination and exclusion due to the ongoing ADA violations at the CITY funded development known as Heritage Square Commons.  Drip Drop Drink and The Crue Barbershop are still in violation of the ADA.

80.     This Court is requested to impose a strong, just, and decisive remedy.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

**COUNT I**
**42 U.S.C. §1983**
**FIRST AMENDMENT RETALIATION**

81.　　Plaintiff CANTER incorporates all previous paragraphs into this section.

82.　　At all relevant times, Plaintiff CANTER had a clearly established right to petition the CITY and criticize government practices without fear of retaliation from government officials (or retaliation from persons who are acting in jointly with government officials) as alleged throughout this Complaint.

83.　　Defendants knew or should have known that Plaintiff CANTER's advocacy, complaints, and criticism of the CITY/DNWM Partnership was protected conduct under the First Amendment.   This also includes Plaintiff CANTER's complaints to other government agencies of which the CITY was aware.

84.　　Each of these Defendants knew that Plaintiff CANTER's advocacy was brought in good faith on behalf of individuals who are frequently marginalized due to no fault of their own.  At some point along the way, all of the Defendants became aware that Plaintiff CANTER's concerns regarding ADA compliance were absolutely correct.[13]

85.　　Nonetheless, Defendants PETERSON, BRIGGS, HASTINGS, FLESER, and POST engaged in a coordinated and prolonged course of retaliation, intimidation and harassment against Plaintiff CANTER.

86.　　In doing so, each of these Defendants understood that their individual and collective acts were creating real and lasting injury.

---

[13] Importantly, under the First Amendment and other retaliation frameworks, it would not matter if Plaintiff CANTER's concerns were unfounded or untrue—*if brought in good faith.*

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

**Retaliatory Adverse Actions**

87.     Because the Defendants were acting as public officials, acting in a government capacity, or enmeshed in joint action with government officials, the schemes to persuade Plaintiff CANTER that Drip Drop Drink was in compliance with the ADA constitutes an adverse action independently. Under the circumstances, an average citizen would be deterred from continuing to advocate in opposition to a cadre of powerful and influential community leaders.

88.     Similarly, every act in support of the joint effort to disparage and discredit Plaintiff CANTER's constitutes adverse government action which would be likely to chill protected conduct.

89.     In July of 2019 CITY officials refused to provide accommodations which would allow Plaintiff CANTER to participate meetings. The accommodation request was reasonable and was submitted under the ADA.  The CITY later removed Plaintiff CANTER from her role on the committee.

90.     Upon information and belief, the CITY's FOIA Coordinator was also instructed to single out Plaintiff CANTER's FOIA requests for disparate treatment. This included delayed responses, inflated fulfillment costs, incomplete responses, and/or a failure to respond at all. The CITY's disparate treatment was motivated, at least in part, by CANTER's complaints about discriminatory practices and a lack of transparency.

91.     DNWM was and is the only Center for Independent Living located in Muskegon County.

92.    In July of 2019, DNWM denied services to Plaintiff CANTER knowing that these same services are routinely provided to similarly situated consumers who have not spoken out against DNWM's partnership with the CITY.

93.    DNWM's denial letter closely follows the narrative which BRIGGS articulated in his 3/11/19 correspondence to HASTINGS.

> *It is unfortunate that the city and yourself has been the target of Accessibility Justice League* [Eleanor Canter]. *Their approach to the issue and code interpretation have been very irregular, even bordering on harassment.*

94.    Drawing on that same theme, FLESER's 7/24/19 letter denying services makes a clear reference to Plaintiff CANTER's critical speech and petitioning activity:

> *Your communications up to present include defamatory claims, false allegations and have been threatening and aggressive in nature. Such behaviors have targeted individual staff, board of directors and/or the organization…*

95.    The adverse actions effectuated by the DNWM Defendants arose directly from the partnership DNWM had established with the CITY.  The adverse actions were also part of a coordinated joint effort to oppose CANTER's criticism of the CITY/DNWM Partnership.

96.    Defendant POST is a private citizen who also conspired with BRIGGS, PETERSON, HASTINGS, & FLESER in an effort to avoid scrutiny regarding his non-compliant development.

97.    As indicated in numerous correspondences between the Defendants, POST *teamed up* as a key player in the joint effort to gaslight Plaintiff CANTER, silence Plaintiff CANTER, and portray Plaintiff CANTER's advocacy as an irrational vendetta.

**Strategic Retaliatory State Court Litigation**

98.     When Defendants PETERSON, BRIGGS, HASTINGS, FLESER, and POST realized that Plaintiff CANTER was not backing down in her petitioning activity, it was agreed that more aggressive retaliatory measures were necessary.

99.     FRANK PETERSON and other CITY officials encouraged HASTINGS and FLESER to threaten legal action in order to stop Plaintiff CANTER from criticizing and complaining about the CITY/DNWM Partnership.

100.    Upon information and belief, FRANK PETERSON and/or other CITY officials encouraged attorneys from Warner Norcross & Judd to make litigation services more readily available to DNWM in spite of the frivolous nature of claims asserted. Warner Norcross & Judd represented several downtown developers who could also have an interest in subjugating Plaintiff CANTER's advocacy.

101.    A letter threatening litigation was issued on 9/20/19.  Although these threats were purportedly asserted on behalf of DNWM, the letter primarily took issue with Plaintiff CANTER's criticism of the CITY/DNWM Partnership.

102.    The threat of litigation is underscored by a specific reference to the CITY's unofficial (but obvious) interest in the demands presented:

> *"In order to avoid a lawsuit, you must immediately stop disparaging and defaming DNWM **and those connected to the organization**."*

103.    These threats constitute adverse action which was intended to intimidate and injure Plaintiff CANTER for retaliatory purposes.

104.    The threats were issued with encouragement and/or material support from CITY Officials.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

105.    Additionally, DNWM was acting as the CITY's partner in making these threats.

106.    DNWM filed suit on 10/16/19 with a defamation complaint that also places a primary emphasis on Plaintiff CANTER's petitioning activity (complaints to the government—most of which concern the CITY/DNWM Partnership).

107.    A copy of the current state court complaint is attached as **Exhibit A**.

108.    On information and belief, the lawsuit filed by DNWM is being paid for by funds other than its own.

109.    Many of the statements identified as "defamatory" are drawn directly from Plaintiff CANTER's complaints, grievances, and FOIA requests (i.e. petitioning activity) to CITY officials (complaints, grievances, and FOIA requests).

110.    While these type of government records are privileged under the First Amendment (and ordinarily deemed sensitive by government officials), Defendant PETERSON and/or other CITY officials funneled these records to DNWM for litigation purposes.

111.    The 5/8/20 amended complaint goes a step further in seeking to enjoin Plaintiff CANTER from "accusing *the City of Muskegon* of 'financing [DNWM's] illegal activity with taxpayer dollars."

112.    As each of the Defendants knew, or should have known, complaints to the government are absolutely privileged under the Petitioning Clause of the First Amendment.

113.   Without evidence of malice, criticism directed at government practices and public figures cannot constitute an actionable claim for defamation and the state court litigation was undertaken as retaliation for Plaintiff CANTER's petitioning activity.

114.   On information and belief, PETERSON and/or other CITY officials encouraged, supported, and/or tacitly approved of the state court litigation knowing that there was no reasonable basis to assert a claim of defamation.

115.   The conduct of these Defendants was reckless and undertaken with complete indifference to Plaintiff CANTER's federal rights to be free from violations of the United States Constitution.

### *Monell* Liability

116.   Acting as the highest ranking decisionmakers in their respective capacities Defendants PETERSON and BRIGGS conspired and collaborated with the DNWM Defendants to retaliate against CANTER.  Without the support, encouragement, and/or tacit approval from the CITY's highest ranking decisionmakers, DNWM would not have initiated or maintained the campaign of harassment (including the sham state court litigation) against Plaintiff CANTER.

117.   Mayor Gawron, Public Safety Director Jeff Lewis, the CITY's ADA Coordinator and at least one City Commissioner tolerated the use of CITY resources in efforts suppress Plaintiff CANTER's complaints.

118.   The City also has a long history of indifference toward constitutional violations and noncompliance with the ADA.  The CITY failed to develop, maintain, and adhere to the training programs and grievance procedures which were established under a 2010 settlement with the U.S. Dept. of Justice (2014-38-109).

119.    For each of these reasons and/or for under one or more of the processes outlined in *Thomas v City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005), the CITY is liable under *Monell*.[14]

**COUNT II**
**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**
**& THE REHABILITATION ACT**

120.    Plaintiff CANTER incorporates all previous paragraphs into this section.

121.    The petitioning activity and public speech described in this Complaint occurred as part of Plaintiff CANTER's opposition to actions and practices which violated provisions of the ADA.

122.    Defendants POST, PETERSON, BRIGGS, HASTINGS and FLESER violated Plaintiff CANTER's rights under 42 U.S.C. § 12203(a) and § 12203(b) by retaliatory action and conduct which was intended to intimidate and interfere with Plaintiff CANTER's advocacy and enjoyment of rights under the ADA.

123.    Knowing that Plaintiff CANTER was an individual with a qualified disability who had engaged in vigorous advocacy regarding ADA violations, these Defendants took individual and joint action to exclude Plaintiff CANTER from civic engagement by refusing reasonable accommodations in violation of 42 U.S.C. § 12131, § 12132, and §12203; AND to deny Plaintiff CANTER the benefit of services, programs or activities in violation of 42 U.S.C. § 12132.

124.    Defendant POST subjected Plaintiff Canter and others to discrimination by refusing to bring Heritage Square Commons into compliance with the ADA.   Plaintiff

---

[14] See *Doe v. Claiborne Cty. ex rel Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 511 (6th Cir. 1996) (citing *Bellamy v. Bradley*, 729 F.2d 416 (6th Cir. 1984); *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir.1993)).

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

CANTER (along with others) was denied entry to the Drip Drop Drink coffee shop because of her disability.

125. In July of 2019, Defendant DNWM denied Plaintiff CANTER (a former employee and qualified consumer) the benefit of services, programs or activities. As indicated by FLESER's correspondence, the denial was motivated, at least in part, by FLESER's distaste for CANTER's opposition to discriminatory practices and ADA violations. This retaliatory denial of services violated 42 U.S.C. § 12132, § 12203(a), and § 12203(b).

126. Because Defendant DNWM's programs and services were federally funded, the retaliatory denial of services also constitutes a violation of § 504 of the Rehabilitation Act, 29 U.S.C. §§ 705, 794.

127. Similarly, the sham defamation lawsuit initiated by DNWM against Plaintiff CANTER, a qualified independent living consumer, was a violation of CANTER's rights under the ADA and the Rehabilitation Act.[15]

**COUNT III**
**VIOLATIONS OF MICHIGAN'S *PERSONS WITH DISABILITIES CIVIL RIGHTS ACT* ("PWDCRA")**

128. Plaintiff CANTER incorporates all previous paragraphs into this section.

129. Michigan's *Persons With Disabilities Civil Rights Act* ("PWDCRA") also prohibits a broad range of discriminatory practices toward individuals with disabilities and those who advocate on their behalf.

---

[15] See e.g. *EEOC v. Levi Strauss & Co.*, 515 F. Supp. 640, 643-44 (N.D. Ill. 1981) ("There is little doubt that a state court defamation action filed in retaliation for having engaged in conduct protected by § 704(a), … violates this section. A literal reading of the statute obviously outlaws all retaliatory acts including lawsuits filed in state tribunals.").

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

130.   MCL 37.1602 provides in pertinent part that: "A person or 2 or more persons shall not…  [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under this act." MCL § 37.1602.

131.   Plaintiff CANTER's complaints regarding ADA violations in the CITY OF MUSKEGON fall squarely within the scope of protected conduct, and the retaliatory conduct of the Defendants is actionable under this statute as well.

### RELIEF REQUESTED

132.   WHEREFORE, Plaintiff ELEANOR CANTER requests this Court to—

a.   Issue a judgement declaring that the Defendants collectively and individually violated Plaintiff CANTER's rights under the First Amendment to the U.S. Constitution, the *Americans with Disabilities Act,* the *Rehabilitation Act*, and Michigan's *Persons With Disabilities Civil Rights Act*;

b.   Enter an order enjoining Defendant POST from continuing to design, construct, and maintain facilities for public accommodation which do not comply with the 2010 ADA standards;

c.   Enter an order prospectively enjoining Defendants from engaging in any further retaliation or interference with advocacy, petitioning activity, or free speech;

d.   Award nominal and compensatory damages under the applicable authorities, in an amount to be determined by a jury.

e.   As allowed by the applicable authorities, award punitive and/or explemary damages for any intentional, indifferent, or malicious infliction of injury, in an amount deemed proper by a jury.

f.   Award attorney fees and all costs of the litigation as provided under 42 U.S.C. § 1988, and the corresponding remedies under the ADA, the Rehabilitation Act and Michigan law.

g.   Award other relief which this Court deems just and necessary.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

## JURY DEMAND

133.   A jury is demanded for all triable issues.

Date: July 21, 2020

RESPECTFULLY SUBMITTED:

/s/ Philip L. Ellison
OUTSIDE LEGAL COUNSEL PLC
by PHILIP L. ELLISON (P74117)
PO Box 107 · Hemlock, MI 48626
(989) 642-0055
(888) 398-7003 - fax
pellison@olcplc.com
Attorney for Plaintiff

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com